## HENRY vs. HARBISON.

Where a father-in-law, upon or after the marriage of a daughter, sends slaves home with her, which are permitted to remain, free from his own control or claim, a gift of the slaves sent is presumed to have been intended by the father to his daughter, unless the contrary is established by proof.

Where a demand and refusal to deliver the property in dispute are pre-requisites to the commencement of a suit, and the defendant admits upon the record a demand, the return of the sheriff upon the writ that the property was found in the possession of the defendant, is sufficient evidence of a refusal to deliver possession.

### *Appeal from Pope Circuit Court.*

HON. JOHN J. CLENDENIN, Circuit Judge.

JORDAN and HOLLOWELL, for the appellant.

Where a parent, upon the marriage of his daughter, suffers property to go into her possession, it is prima facie evidence of

a gift.   4 *McCord* 228; 1 *Ib.* 214, 139; 4 *Iredell* 165; 1 *Hay.* 2; *Ib.* 97; *Ib.* 451; 2 *Ib.* 126; 5 *Mon.* 504; 1 *Ala.* 652; 20 *Ib.* 720; 22 *Ib.* 422; 3 *Hen. & Munf.* 127; 2 *Bibb* 32; 4 *Ib.* 73.

The defendant having admitted, and made it a matter of record, that a demand in due form was made before suit brought, was estopped from denying a demand, or of taking any advantage for want of it.

Mr Justice FAIRCHILD delivered the opinion of the Court.

In 1852, Henry, the plaintiff below and appellant here, married Mary Ann Harbison, a daughter of John Harbison. The married couple left the house of John Harbison about the first of January, 1853, for their own home, in his neighborhood, taking with them a negro, Martha, which remained with them till August, 1853, when Martha returned home, and in her place the negro girl, Phillis, was sent to Henry's house. There she remained till the fall of 1855, when both Harbison and Henry removed from South Carolina, the place of their residence, to Pope county, in this state. In the latter place both families lived, Phillis remaining in the family of Henry, and under his control, until in September, 1857, she was taken by John Harbison, and after his death, in July, 1858, she came to the possession of the defendant, Hugh Harbison, who may be supposed to have been holding Phillis for the plaintiff, to whom John Harbison conditionally willed the slave. Hence, to recover the negro, the plaintiff brought this suit, an action of replevin, against Hugh Harbison.

The matter to be determined is, whether Phillis, in September, 1857, was the property of the plaintiff or of John Harbison.

It is well settled by a course of decisions prevalent in the Southern States, that when a father-in-law, upon or after the marriage of a daughter, sends slaves home with her, which are permitted to remain free from his own control or claim, that a gift of the slaves sent is presumed to have been intended by the father to the daughter. *Farrel vs. Perry*, 1 *Haywood* 2; *Par-*

*ker vs. Phillips, ib.* 451; *Davis vs. Duncan,* 1 *Mc Cord* 151; *Smith vs. Montgomery,* 5 *Mon.* 504.

Whenever the question of ownership of such slaves arises upon a controversy between the father and son-in-law, or their representatives, the inquiry is, whether the slaves were the subjects of a gift, or of a loan. This is a question of intention. But without facts showing a contrary intent, it will be taken that the father intends a gift to his daughter. And the contrary must be clearly established. This conclusion is in obedience to the dictates of parental duty and affection.

Upon the settlement of a daughter in life, a father's acts towards her are to be construed in the way that will best discharge the obligation which binds him to provide for his child, and will the most promote her advantage. This construction tends much to repress family strife, to promote open and fair dealing between the parties affected and those with whom they have business.

To ascertain the intention of John Harbison, in permitting Phillis to be sent to, and remain in the family of the plaintiff, from August, 1853, to September, 1857, it may be noted, tha upon the plaintiff and his wife first commencing house-keeping, Martha was sent home with them because John Harbison being behind with his work, wished to keep Phillis, who was older and a field hand, to assist him in the coming crop, that after the crop was worked, Phillis, who had, in Harbison's family, been called the servant of Mary Ann, was permitted to go to her and her husband; that she remained in the family of the plaintiff while he and Harbison lived near together in South Carolina, till the fall of 1855, without any claim being made to the negro by Harbison; that the two families then moved together to this state; that Harbison hired out his negroes, and Henry hired Phillis to the same hirer; that the wages of Phillis were paid to Henry, were never claimed by Harbison, and that Phillis remained under the exclusive control and claim of Henry for more than a year after the death of his wife.

The expressions of dissatisfaction made by John Harbison to

his wife, when she had sent Phillis to their daughter, Mrs. Henry, as stated by Margaret Dickey, and the evidence of the two Wylies, taken in connection with the proof of the foregoing facts, do not affect the legal character of the continuous notorious acts of Henry's claim of the negro, and of John Harbison's concession to that claim.

A few authorities, additional to those referred to, containing the same principle, but specially applicable to the facts of this case, may be cited. The Supreme Court of North Carolina, in 1794, said: "When a man sends property with his daughter, upon her marriage, or to his son-in-law and daughter, any short time after their marriage, it is presumed, *prima facie*, that the property is given absolutely in advancement of his daughter; and when the property is permitted to remain in the possession of the son-in-law for a considerable length of time, as in this case, it will be necessary to prove, very clearly, that the property was only lent by the father, and that it was expressly and notoriously understood not to be a gift at the time. The peace of families, and the security of creditors are greatly concerned in the law being thus settled. * * * * * * This property was given in the usual manner, that is, sent with them on their going to house-keeping, as it is called, or sent to them as soon as the parent could make the necessary arrangements in his farm, or family, for that purpose." *Carter vs. Rutland*, 1 *Haywood* 97.

The facts in a South Carolina case are much like those disclosed in this case, although the negro was not sent by the father to the house of the son-in-law till a year after the marriage. The negro remained at the house of the son-in-law till the death of the wife and daughter, when the father claimed and got possession of the negro, for which the son-in-law brought an action of trover. On the trial, the judge charged the jury that the rule of law, that where a parent suffered property to go with a child, upon marriage, a gift was implied, did not apply because the negro was not sent to the son-in-law till a year after marriage. On complaint of this charge, the

court held as follows: "We are constrained to grant a new trial, for the position, as stated by the court, is not law, and it may have influenced the jury in making up their verdict. The long and well established doctrine is, that the presumption of a gift may arise from the circumstance of a parent sending a slave to a married child, aud suffering it to remain in the possession of such child, without any express stipulation on the subject, and that whether the property be sent immediately on the marriage or some time after. The time at which it was sent may strengthen or weaken the presumption. If sent home with the child immediately on the marriage, it is almost conclusive. If a long time *after*, still the presumption may arise, although it is not so conclusive.   *   *   *   In the case of *Hatton vs. Banks*, the negroes were not sent when the young people first went home." *McCluney vs. Lockhart*, 4 *McCord* 251. The same doctrine is held in Alabama, in cases that also declare upon facts that show the intention of the father in parting with the possession of the negro. *Olds vs. Powell*, 7 *Ala., N. S.*, 655; *Williams vs. Maull*, 20 *Ala.* 729.

It follows that the first, second and fifth instructions of the plaintiff, which embodied the principle maintained in this opinion, were legal and applicable, and were improperly refused by the circuit court.

At the instance of the defendant the circuit court instructed the jury, that if a father permitted a slave to work for a married daughter and her husband, and to remain at their house three or four years, that did not give the husband the right of property in the slave. This instruction was inapplicable to the facts of the case, and in itself calculated to mislead the jury, and taken in connection with the refusal of the court to give the first, second and fifth instructions asked by the plaintiff, was prejudicial to the plaintiff, and illegal. The first instruction of the defendant should not then have been given without such modifications as to make it consistent with the law as herein announced.

A record entry in the cause states that it was admitted by

the defendant, that a demand was made of the negro in controversy, before the commencement of the suit, in due form. It was also proved by the sheriff's return, which was legal evidence, that the negro was taken out of the possession of the defendant.

There was then no foundation in the case for the fourth instruction of the defendant, that a demand was not sufficient without a refusal by the defendant to deliver possession, for the plaintiff to maintain his action. After the demand was made the negro would not have been found by the sheriff in the possession of the defendant unless he had refused to comply with the demand, and after the admission by the defendant of the demand, he ought not to have asked for his fourth instruction. In obtaining it, the defendant subjected his judgment to review for an erroneous ruling of the court.

The judgment of the circuit court is reversed, with instructions to grant a new trial upon its return to the circuit court of Pope county.